UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                                                                        CASE NO. 5:24CR00323 (BKS)

  -v-

MICHAEL WILLIAMS,

                  Defendant.

---

# **SENTENCING MEMORANDUM**

DATED:      July 28, 2025                      Respectfully submitted,

                                                          LISA A. PEEBLES
                                                          Federal Public Defender

                                                By: Randi J. Bianco, Esq.
                                                   Supervisory AFPD
                                                   Bar Roll No. 507514
                                                   Clinton Exchange, 3rd Floor
                                                   4 Clinton Square
                                                   Syracuse, New York 13202
                                                   (315) 701-0080

I.      **PRELIMINARY STATEMENT**

On August 23, 2024, pursuant to a written Rule 11(C)(1)(A) plea agreement the defendant Michael Williams, hereinafter "Michael," pled guilty to a single count information charging him with Deprivation of Rights Under Color of Law in violation of 18 U.S.C. § 242. Michael is scheduled for sentencing on September 26, 2025.

A Presentence Investigation Report (hereinafter referred to as "PSR") was prepared by the United States Probation Department on October 31, 2024, in anticipation of his sentencing. According to the PSR, Michael's total offense level is 19 after acceptance of responsibility and his criminal history category is 1, which results in a guideline imprisonment range of 30 to 37 months imprisonment. Probation has identified mitigating/protective factors outside of the advisory guideline system [PSR ¶67]. Specifically," [t]he defendant's status as a correctional officer trainee." Additionally, Judicial Sentencing Information database (JSIN) determined "during the last five fiscal years (FY2019-2023), there were 9 defendants whose primary guideline was §2H1.1, with a Final Offense Level of 19 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 8 defendants (89%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 26 month(s) and the median length of imprisonment imposed was 24 month(s). For all 9 defendants in the cell, the average sentence imposed was 24 month(s) and the median sentence imposed was 24 month(s)."

The Supreme Court's decision in *United States v. Booker* and *United States v. Fan-Fan*, 125 S.Ct. 738 (2005) excised the provisions in the Sentencing Statute which make the guidelines mandatory and held that they are only advisory and can do no more than require a

2

court to consider guideline ranges. *See* 18 U.S.C.§ 3553 (a)(4). Therefore, in determining a sentence, a court must not only consider guideline calculations but equally take into account all other statutory concerns listed in 18 U.S.C. § 3553 (a)(2), as well as the unique circumstances of the Defendant. *See* § 3553 (a) (Supp. 2004).

The Sentencing Reform Act provides, in part, that:

The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in Paragraph (2) of this subsection. The Court, in determining the particular sentence to be imposed shall consider:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant; [and]

(2) The need for the sentence imposed;
   (A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B) To afford adequate deterrence to criminal conduct;
   (C) To protect the public from further crimes of the defendant; and
   (D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. (18 U.S.C. § 3553(a)).

After careful consideration of the totality of relevant circumstances surrounding this case, we are asking this Court to grant a variance and sentence Michael to a term of probation.

## II. THE NATURE AND CIRCUMSTANCES OF THE OFFFENSE.

Michael was hired as a corrections officer trainee at Midstate Correctional Facility in October 2022. Michael was only a high school graduate and had no prior law enforcement experience when he was hired. Michael was trained for eight weeks and completed the training on January 6, 2023. Two days later, without any real-world experience, he began working as a correctional officer trainee at Midstate Correctional Facility. He was still on probation when this offense occurred on April 13, 2023. On that date he was asked by Correctional Officer 1, a more

3

senior officer, to assist he and Officer Khan with inmate "J.B.". Kahn had a military background and was a mixed martial artist fighter. Michael had no idea what was about to happen when he agreed to assist the more senior officers. Corrections Officer 1 directed Correctional Officer 3, who was in charge of the unit on that shift, to wake up J.B. and bring him to the hallway outside the unit [Plea Agreement ¶ 5(d)]. When J.B. was brought into the hallway, Michael asked J.B. to put his hands on the wall and hold his identification up against the wall as he was trained to do [Plea Agreement ¶ 5(e)]. J.B. complied and without provocation Corrections Officer 1 and Corrections Officer Kahn assaulted J.B. by punching and kicking him in the body and legs [Plea Agreement ¶ 5(f)]. J.B. began to move off the wall and Michael swept J.B.'s legs out from under him and pinned him down *[Id]*. Although Michael was only a trainee, he admits that he had no legal basis to bring J.B. to the ground as part of the unjustified assault [Plea Agreement ¶ 5(g)]. Michael was suspended a few days later. Michael had only been working at the facility for a little more than three months at the time.

After the assault, senior Correctional Officer 1 convinced Michael that they needed to deny that they had any involvement in the assault of J.B. Michael agreed to do so. Following Correctional Officer 1's lead, Michael denied any involvement in the assault when questioned by internal investigators with the New York State Department of Corrections and Community Supervision [Plea Agreement ¶ 5(i)]. An investigation commenced and Michael was officially terminated from his job as a correctional officer trainee on July 15, 2023.

### III. <u>ABERRANT BEHAVIOR</u>

This incident was completely out of character for Michael. Under U.S.S.G § 5K2.20, the Court is permitted to depart downward in sentencing if the defendant's conduct was based on aberrant behavior. The defense submits this was an isolated incident and qualifies as aberrant

behavior. Under U.S.S.G. §5K2.20(b) this was a single criminal occurrence that: 1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life. See *United States v. Leyva-Franco,* 162 F. App'x 751, 752 (9th Cir. 2006).

Here, Michael had only worked at the facility for a little more than three months when he was called to assist Senior Correctional Officer 1 and Officer Kahn with an inmate. Michael had never met this inmate and had no idea what was about to take place. Likewise, Michael did not know if the two officers had planned the assault in advance before he was called over to assist them. Michael had absolutely no part in the planning of the assault, if in fact there was any planning. The assault was of limited duration and occurred over a few minutes. Finally, this event represented a marked deviation from Michael's otherwise law-abiding life.

A departure under §5k2.20 is not prohibited under sections (c)(1)- (4): (1) The offense did not involve *serious* bodily injury or death (italics mine)[1]; (2) There was no firearm or dangerous weapon used; (3) this offense was not a drug trafficking offense; and (4) the defendant has no criminal history or any prior criminal behavior.

Michael has no prior criminal history and no history of violence. He has sincere remorse for what happened to J.B. and states, "I feel very bad about what I did to him, and I want to make things right and tell the truth" [PSR ¶17]. As will be discussed later, Michael was bullied throughout his childhood and as a result, was always a follower, not a leader. When asked by Senior Correctional Officer 1 to assist him, Michael did not know what he was about to participate in. What followed happened quickly before Michael had any chance to think about it. Michael has never been a man

---

[1] Any serious physical injury J.B. suffered occurred the following day and was inflicted by another inmate [PSR ¶¶ 10-11].

who hurt others, and he now suffers from anxiety, depression, and panic attacks because of his participation in the assault. He is in counseling now to deal with these issues. (See Attachment B)

IV. **MICHAEL'S HISTORY AND CHARACTERISTICS**

   a) **Childhood**

Michael grew up in a two-parent home with his sister in Suffern, New York. His mother was a nurse, and his father was a correctional officer [PSR ¶8]. Michael was not like his father. He was small and sensitive and was constantly bullied by his peers throughout middle school and high school [PSR ¶39]. He received numerous black eyes, bruises, fat lips and name calling. Although he reported the bullying, no one did anything about it. This left him very fearful, and he became a follower to avoid being beaten up. He continued being a follower in his adult life. For example, he only became a correctional officer after his father and his brother-in-law encouraged him to do so in order to obtain insurance and good benefits [PSR ¶42].

Michael's childhood was not without additional trauma. When he was 12-year-old, he witnessed a death that left him so shaken his parents had to take him for counseling for over a year. Michael was riding his bike with his family when a man pulled up in a car and asked him if he wanted to race. After Michael said no, the man sped off and proceeded to crash into an innocent bystander on the bike path, killing him. Michael witnessed the entire event and had to testify against the man in Court. Michael believes this left him with post-traumatic stress disorder although he was never formally diagnosed. He entered counseling for a year after the incident. [PSR ¶ 44]. When Michael was 14 years old his grandmother and uncle died on the same day. He was very close to them both. He went back into counseling after their deaths. [PSR ¶44].

   b) **Education**

When Michael was young, he was diagnosed with attention deficit hyperactivity disorder

and prescribed Ritalin and Adderall [PSR ¶44]. While in school he received an Individualized Education Plan because of learning difficulties [PSR ¶46]. He managed to graduate from high school in 2006 and then enrolled in community college where he lasted only ½ of one semester [PSR ¶ 46].

### c) Extracurricular Activities and Volunteer Work

Michael always wanted to belong and fit in with the other children. He participated in the Boy Scouts from the ages of 6-18 years old. He states that the Boy Scouts had a positive impact on his life, and he became interested in volunteer work. At age 14 he volunteered with the local ambulance company in the junior squad learning about being an EMT and first aid, CPR, and other emergency medical field skills. He would go out and help in all kinds of weather, any time of day or night—if he were assigned a shift, he was there. [See Joan Taylor's Letter]. Between the ages of 15-16 he volunteered at the local fire department. [PSR ¶48]. His lifelong friend declares that throughout their years of friendship, Michael "selflessly served his community" and that "his desire to give back speaks to his generous spirit and strong sense of community." [See John Turnbull's Letter].

### d) Wife and Child

Michael has been married to his wife Jaime for eight years. They have a five-year-old daughter, and the family is very close. Michael shares his love of the outdoors with his daughter, taking her fishing, kayaking, and camping. Michael and Jaime purchased their first home together in 2018. Jaime works at Lowes as a sales associate, while Michael is the primary breadwinner for the family. Michael is known as a dedicated husband and father in his community, a father who puts his family's needs in front of his own. [See letters from Adam Basilicata, Gail Burnett, and Michael Holbrook]. His wife believes Michael works and feels as if his sole purpose was to provide for his

family and for his family to be happy and healthy. [See Jamie Williams' Letter].

### e) History of Strong Employment

Michael is a hard worker and has always been employed supporting his family. He is a member of the local IBEW Union working at Nelson's Tree Service as a journeyman lineman removing trees around power lines. He worked there from 2013 to 2021. He went back to work at Nelson's after he was terminated as a correction officer trainee. Part of Michael's job involves going to locations for emergency cleanups after storms. His co-worker described Michael as a very hard worker with an amazing amount of patience. [See Michael Holbrook's Letter]. He is known for dealing with overwhelmed and agitated customers calmly and patiently. *Id*. In fact, Michael has never had a problem with any of his prior employers until he worked at the prison. Before working at Nelson's Tree Service, Michael worked for the County of Sullivan and the Town of Fallsburg as a machine equipment operator. Before that he worked as a tow truck driver. In high school he worked full time at Monroe Muffler [PSR ¶ 50]. Courts have considered A history of strong employment as grounds for a downward departure. *U.S. v. Jagmohan*, 909 F.2d 61 (2d Cir. 1990) (exceptional employment history and nature of the crime); *U.S. v. Big Crow*, 898 F.2d 1326, 1331-32 (8th Cir. 1990) (excellent employment record).

### V. A SENTENCE OF IMPRISONMENT WILL BE EXCEPTIONALLY HARSH FOR A FORMER CORRECTIONAL OFFICER ACCUSED OF ASSAULTING AN INMATE.

The court must consider the need for the sentence imposed, and a sentence of incarceration would be unduly harsh in light of Michael's position as a former correctional officer accused of assaulting an inmate. Given Michael's background, history, and characteristics, a sentence of

probation would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense 18 USC §3553(a)(2)(A). Michael has pled guilty and is now a convicted felon. His previously clean record will be forever tarnished. As far as a just punishment is concerned, a prison sentence would be extremely dangerous for Michael. While Michael was only a correctional officer trainee for a short time when the offense occurred, inmates will not differentiate between a trainee and a correctional officer. If he is incarcerated for this offense, not only will he be seen as a correctional officer, but as one who was involved in the beating on an inmate. This makes him vulnerable to abuse in prison. We submit that this Court should grant a departure under USSG 5k2.0 because of this unique vulnerability. See *U.S. v. LaVallee,* 439 F.3d 670 (10th Cir. 2006) (District court did not abuse its discretion when it gave defendants who were former prison guards a two-level downward departure under USSG §5k2.0 based on their susceptibility to abuse in prison after they were convicted of conspiring to deprive inmates of their constitutional rights).

Considering the recent publicity surrounding the brutal assault of inmate Robert Brooks at Marcy Correctional Facility on December 9, 2024, defense counsel must address the elephant in the room and the obvious differences in the two cases. Unlike the correctional officers in the Brooks assault, Michael was only a correctional officer trainee at the time of the assault. He had no advanced notice that an assault would take place and was called to the hallway by a senior officer to assist them. What Michael did was wrong, but it cannot be compared to the conduct in the Brooks assault.

VI.     **MICHAEL WAS A MINOR PARTICPANT IN THE OFFENSE.**

Michael should receive a two-level downward adjustment as he was a minor participant in

the criminal activity under U.S.S.G. §3B1.2(b). A minor participant applies to a defendant who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal. Michael was a correctional officer trainee at the time of the offense and had only been working in that capacity for a little more than three months. He was still on probation and looked to more experienced officers as to how to respond in dealing with situations involving the inmates. When the offense was first initiated, he was directed to assist Senior Correctional Officer 1 and Officer Kahn. They were the individuals who instigated the assault and could be considered the organizers or leaders of the criminal activity. He did not participate in the planning or organizing of the criminal activity. He did not exercise any decision-making authority. His participation was minor and brief when compared to the other correctional officers and he did not benefit from the criminal activity.  See USSG §3B1.2 comm 3(c).

### VII.   MICHAEL'S OTHERWISE BLAMELESS LIFE AND GOOD CHARACTER

Michael has no prior criminal history and no history of violence before the instant offense. He has been employed his entire adult life and has no history of substance abuse or personal instability. This offense occurred on April 13, 2023.  Michael accepted responsibility for his actions and pled guilty at his initial appearance on August 23, 2024**.** He was released on personal recognizance and has continued to lead a law-abiding life, working and supporting his wife and child.

His family and friends know Michael as a "positive force in the lives of everyone he encounters." [See John Turnbull's Letter]. Sgt. Adam Basilicata, a long-term family friend describes Michael as a respectful, law-abiding resident. [See Adam Basilicata's Letter]. He is

also known for his extreme kindness. One time he drove from New York to Pennsylvania to give his young cousin pizza during her exams. [See Gail Bernett's Letter]. When Michael's sister had to leave her home for safety reasons during her divorce, Michael was the first to open his home to her and her children. [See Melissa Brown's Letter]. When his cousin's tree fell due to a storm, Michael took off work without hesitation to help her. [See Rachel Taylor's Letter]. When Michael tragically lost his grandmother and uncle on the same day, he took it upon himself to be there for his cousins and always make sure they were all right. [See Rebecca Taylor's Letter]. He even became his uncle's son's role model, teaching him what his uncle would have taught him if he were still alive. *Id*. One time, Michael saw a man on the side of the road and quickly pulled over to help. [See Jamie William's Letter]. The man was experiencing heart attack symptoms, and Michael stayed with the man until the paramedics came and he was safe. *Id*. Michael is described as someone who will drop whatever he is doing, day or night, to help others. [See Support Letters]. He simply would go out of his way to help a friend, or anyone he sees in distress. [See Llewellyn Williams's Letter]. Ultimately, "he's truly an amazing friend, husband, father, and member of society." [Michael Holbrook's Letter].

Given that this offense occurred in April of 2023 and Michael has shown that he can continue to lead a positive law-abiding life, the Court should impose a non-incarcerative sentence, as prison is not necessary to protect the public from the unlikely event Michael will commit any future crimes. See *U.S. v. Autery,* 555 F.3d 864 (9th Cir. 2009) (where defendant convicted of poss. of porn. and where guidelines 41-51 months, court's sua sponte variance to probation not unreasonable in part because of his positive characteristics "such as his having no history of substance abuse, no interpersonal instability, no sociopathic or criminalistic attitude, his

11

motivation and intelligence, and the support of his wife and child." These characteristics 'undoubtedly constitute 'history and characteristics of the defendant that justify a variance below the guidelines).

### VIII. A SENTENCE OF PROBATION WOULD PROVIDE AN ADEQUATE DETERRENCE TO CRIMINAL CONDUCT AND PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT UNDER 19 USC 3553(A)(2)(B) & (C).

In addition to having a felony conviction and going through a federal prosecution, Michael has suffered other collateral consequences of his conviction. He has lost his job with the Department of Corrections and Community Supervision. He can no longer work in any branch of law enforcement. This sends a message that violence against inmates will not be tolerated and those who take part in such behavior will be prosecuted. In determining an appropriate sentence, the Court should look at Michael's role in the instant offense and his otherwise blameless life and good character.

### IX. CONCLUSION

In *Nelson v. United States*, 555 U.S. 350 (2009), the Supreme Court held that "the court may not presume that the guidelines range is reasonable." Here, based on the factors outlined above in 18 U.S.C. 3553(a), a guideline sentence of 30 to 37 months incarceration would be greater than necessary to comply with the purposes of punishment. While Michael should be punished for this offense, we ask the Court to consider a sentence of probation on the factors outlined in 18USC 3553(a) cited above.

DATED:  July 28, 2025				Lisa A. Peebles
							Federal Public Defender

					By:	*s/Randi J. Bianco, Esq.*
						Supervisory AFPD
						Bar Roll No. 507514
						4 Clinton Square, 3rd Floor
						Syracuse, New York 13202
						(315) 701-0080

To:	Michael Perry, AUSA
	Michael Gadarian, AUSA
	Michael Williams